**TEXAS BANK & TRUST COMPANY,**
Appellant,

v.

**CAMPBELL BROTHERS, INC., et
al., Appellees.**

No. 19489.

Court of Civil Appeals of Texas,
Dallas.

May 31, 1978.

Rehearing Denied June 29, 1978.

W. Ted Minick, Winstead, McGuire, Sechrest & Trimble, Dallas, for appellant.

Jim E. Cowles, R. Brent Cooper, Touchstone, Bernays & Johnson, Sam S. Stollenwerck, Thomas K. Boone, Dalton, Moore, Forde, Joiner & Stollenwerck, Lynn Phillips, Dallas, for appellees.

GUITTARD, Chief Justice.

This suit arose out of a contract for construction of an apartment project. The contractor, Campbell Brothers, Inc., stopped the work because of failure of the owner, San Mateo Properties, Inc., to make a progress payment pursuant to an application for payment presented by the contractor. The contractor sued the owner for the amount alleged to be due and also for damages for breach of contract, and joined as a defendant Texas Bank & Trust Company, alleging that the contractor had a lien superior to the deed of trust securing the bank's construction loan. The owner and the bank counterclaimed against the contractor and the surety on the contractor's performance bond, alleging breach by the contractor in failing to complete the contract and damages consisting of the excess of the cost of completion over the contract price. The jury's answers to special issues were favorable to the contractor and the surety. From a judgment on this verdict, only the bank has appealed.

We hold that recovery by the owner and the bank was properly denied because the evidence supports the jury's finding that the owner had failed to make payments as required by the contract when the contractor left the job, and the bank, as a co-obligee on the contractor's performance bond, has no independent right to demand performance without payment of the amount due. We hold also that the trial court properly determined the contractor's statutory lien to be superior because the evidence supports the jury finding that the contractor had commenced visible construction of the project before the bank recorded its deed of trust. In response to the contractor's cross-point, we hold that the trial court properly declined to include in the amount secured by the contractor's lien the contractor's lost profit on work not performed. Accordingly, we affirm the judgment of the trial court in all respects.

## 1. Owner's Claim for Breach of Contract

Although the owner has not appealed, we consider first the owner's claim for breach of contract, since the bank's position depends on the owner's claim in some respects. For this purpose, we temporarily defer the bank's claim that it has established grounds of recovery not available to the owner.

The contract sued on provides for reimbursement of the contractor's costs plus a fixed fee, with an overall limit of $2,636,738. The owner is required to reimburse the contractor for costs as the work progresses on applications for payment submitted by the contractor. The contractor stopped the work on December 2, 1974, after the owner failed to pay the amount the contractor claimed to be due on application number 29, presented on November 1, 1974.

In asserting a breach by the contractor, the bank attacks the jury's answer to special issue number 15, by which the jury found that at the time the contractor terminated the work, the owner had failed to pay for work done or materials furnished under the contract contained in application for payment number 29. The bank contends that this finding has no support in the evidence, and, in the alternative, that it is contrary to the great weight and preponderance of the evidence, in that the evidence shows that no money was due from the owner because the contractor had earlier charged to the job more than $53,000 of work that was not within the scope of the contract.

Application number 29 states the amount of work "completed and stored to date" to be $2,091,746, and since the contractor admitted receiving payments aggregating $2,038,238, the indicated balance due would be $53,508. The bank argues that nothing was due to the contractor when it left the job because the work "completed and stored to date" was overstated by more than the amount of this balance. According to the bank, the following items are shown by the undisputed evidence to have been improperly included:

(1) $17,774 for work done on the site before the contract work began;

(2) $17,680 for a bond premium not included in the contract amount;

(3) $2,205 for a building permit not included in the contract amount;

(4) $36,067 for work done on the residence of George Jones, sole stockholder of the corporate owner, San Mateo Properties, Inc.

The aggregate amount of these claimed reductions is $73,726. The bank says that none of these items actually appeared in application number 29, but that the amounts were concealed within this application under the amounts stated for other items of work shown to have been done under the contract.

The contractor responds that there was no fraud or deception because all of the items in question were known and understood by the owner and all were sums legitimately due. The contractor insists that it had actually paid out the amounts in question for site work, bond premium, and building permit, and that all were properly charged against the owner. The contractor further asserts that it had actually done work on the Jones residence to the extent of $36,067, and that payments in this amount, as well as payments for the other items in question, had previously been credited to the owner and had been included in the total payments of $2,038,238, which the contractor had received. Thus, the contractor argues that it was entitled to apply the previous payments received to those disputed items rather than to amounts due strictly within the terms of the contract and that it was entitled to stop the work until payment of the balance was received. Moreover, the contractor asserts, there was no dispute concerning the work actually done in the period for which application number 29 was submitted. Consequently, it argues that neither the owner nor the bank could properly withhold payment for this work on the ground that previous payments, which had been credited by the contractor to other legitimate claims, were not applied to the amounts due under the contract in question.

With respect to the work done on the Jones residence, there is at least a dispute in the evidence as to whether any proceeds of the bank's loan were used for that purpose. Jones testified that he paid approximately $79,000 of his own funds to the contractor in September, October and November of 1974. Thus, it would have been reasonable for the jury to conclude that although various applications for payment

included work on the residence as well as on the apartment project, the bank was not prejudiced because the amount of the residence work so charged was more than offset by payment from Jones' personal funds.

■ The owner's obligation to make progress payments and the contractor's right to stop the work if such payments are not made depend on the provisions of the contract documents. Article 14 of the contract provides:

> The Contractor shall, at least ten days before each progress payment falls due, deliver to the Architect a statement, sworn to if required, showing in complete detail all moneys paid out or costs incurred by him on account of the Cost of the Work during the previous month for which he is to be reimbursed under Article 6 and the amount of the Contractor's fee due as provided in Article 7, together with payrolls for all labor and all receipted bills for which payment has been received.

Article 15.1 provides further:

> The Architect and/or Owner will review the Contractor's statement of moneys due as provided in Article 14 and will promptly issue a Certificate for Payment to the lender for such amount as he approves, which Certificate shall be payable on or about the 10th and 25th day of the month.

The contract refers to and incorporates printed "general conditions," of which paragraph 9.6.1 provides as follows:

> [I]f the Owner should fail to pay the Contractor within seven days after the date of payment established in the Agreement any amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and the Architect, stop the Work until payment of the amount owing has been received.

The undisputed evidence shows that no architect was employed to examine and certify applications for payment and that the amounts requested in previous applications had been paid on the approval of Jones.

Application number 29 was also approved by Jones with an adjustment of $1,873. It is dated November 1, 1974, and covers work for the period from October 16 to November 1.

On November 22, 1974, the contractor delivered a letter to Jones stating that $50,017 was past due on the San Mateo Apartment project and that if this amount were not paid within seven days, the contractor would be forced to stop the work. Copies of this letter were delivered to the bank and the surety. The contractor's president, Eugene Campbell, testified that the last day of work on the project was November 27, the day before Thanksgiving day, and that no work could be done on the following Friday because of the holiday. Consequently, the first day that work was actually left undone was the following Monday, December 2, more than seven days after the notice was delivered.

It is undisputed that no payment was made after the letter was delivered on November 22. The bank refused to advance any more funds on the stated ground that the contractor was "getting a little heavy" in its applications for payment. This statement was taken to mean that the contractor's billings exceeded the work actually completed.

■ We conclude that the evidence thus summarized is sufficient to support the jury's finding in answer to special issue number 15 that at the time the contractor terminated the work, the owner had failed to pay for the work done or materials furnished under the contract contained in application number 29. This application was a request for payment for work completed in the period from October 16 to November 1. The evidence shows without dispute that none of the labor or materials listed for that period was for costs incurred outside the contract. It is also undisputed that on December 2, when the contractor discontinued the work, at least the $50,017 stated in the contractor's letter of November 22 was past due and owing to the contractor, if only the work covered by the period of application no. 29 is considered.

The owner is in no position to say that the amount of contract work shown on the application to have been "completed and stored" was overstated because Jones, who handled all of the transactions for the owner, well knew that this figure included costs incurred by the contractor outside the terms of the contract, and that payments had been made to cover these costs. The contractor and the owner were privileged, between themselves, to handle all statements and payments out of the single account in the name of the apartment project, and they were also privileged to apply some of the payments to items legitimately due, but not covered by the contract, particularly since those payments were more than offset by payments out of Jones' own funds.

If application number 29 is adjusted, as the bank says it should be, by reducing the "total completed and stored to date" to the extent of these non-contract items, then, as between the owner and the contractor, the payments received by the contractor must also be adjusted so as to credit Jones with payment of those items in view of his testimony that he had paid more than that amount out of his personal funds. These adjustments would offset each other, leaving a balance due the contractor on application number 29 of at least the amount claimed in the notice of November 22.

Jones, acting in lieu of a supervising architect, had approved previous applications which included the non-contract work in the amounts shown as completed and stored, and had also approved the amount claimed under application number 29 as completed and stored. In view of this repeated cumulative approval of the inclusion of non-contract work in prior applications, the owner may not now say that payments under prior applications should not have been credited to the amounts due for the work on Jones' residence. Neither is the owner in a position to assert that payments that had been applied to amounts due for the site work, the bond premium, and the building permit fee should not have been so applied to those items, which were legiti-

mate expenses of the apartment project, even though they may not have been included in the contractor's reimbursable costs under the terms of the contract.

If the owner had taken the position when it received the notice of November 22 that all of its payments should have been credited to the contractor's reimbursable costs under the contract and none to those items outside the contract, and had demanded that adjustments be made so that the contractor's claimed balance of $50,017 should be considered paid and that the items outside the contract should be considered unpaid, the contractor would have been justified in responding that under the terms of the contract Jones' approval of the previous applications was binding on the owner. Having failed to demand such an adjustment at that time, the owner is in an even poorer position to make such a demand after approving application number 29, but failing to pay the amount shown by that application to be due, particularly after the contractor had stopped the work because of such failure.

The bank contends in the alternative that the notice given on November 22 was premature because payment was not due until November 25. It argues that since the payment dates specified in article 15.1 of the contract are the 10th and 25th of each month, and since article 14 requires that the applications for payment be submitted "at least ten days before each progress payment falls due," and November 10 was only nine days after application number 29 was presented on November 1, the next progress payment date was November 25. Accordingly, the bank asserts the contractor was required to wait until seven days after November 25 before giving the notice and then another seven days until December 9 before stopping the work.

We conclude that the contract is not reasonably subject to the construction that the contractor was required to continue working as long as five weeks before receiving payment on application number 29. Such a construction ignores the words "on or about" in article 15.1. By the express

provision of that article, the payment dates are "on or about" the tenth and twenty-fifth days of each month. When application number 29 was presented on November 1, the next day "on or about" the tenth or twenty-fifth of the month, allowing ten days after presentation of the application, was November 11. Under paragraph 9.6.1 of the general conditions, the contractor was authorized to give the notice seven days after that date, on November 18, but the notice was not given until November 22. Accordingly, the notice was timely, and when the work was discontinued on December 2, the seven additional days had also expired without payment of the amount due. Consequently, the contractor was not guilty of a breach of contract by stopping the work on that date.

### 2. *Bank's Claim for Breach of Contract*

So far, we have considered only whether there was a breach of contract as between the contractor and the owner. We turn now to the bank's contention that it has established an independent claim against the contractor and its surety on the contractor's performance bond, on which the bank was co-obligee.

After the contractor stopped the work, the bank made demand on the contractor to complete the contract, but did not tender the balance which the contractor claimed to be due. The bank and the owner then engaged another contractor, who completed the work, and the bank claims $197,057 as damages for the increased cost of completion over the price limit specified in the original contract. The bank contends that even if the owner was in default when the contractor stopped the work, as the jury found in answer to issue number 15, the contractor had an independent duty to the bank, as co-obligee on the performance bond, to complete the work according to the contract, and that the bank has an independent right to damages for its failure to do so.

We find nothing in the bond that imposes such a duty on the contractor. The bond states that "if the contractor shall promptly and faithfully perform said contract, then this obligation shall be null and void," and further provides:

There shall be no liability on the part of the principal or surety under this bond to the obligees or either of them, unless the obligees, or either of them, shall make payments to the principal . . . . strictly in accordance with the terms of said contract as to payments, and shall perform all the other obligations required to be performed under said contract as the time and in the manner therein set forth.

Under this provision, the bank might have been entitled to demand that the contractor complete the job if it had tendered the balance currently due under the terms of the contract. Certainly, nothing in the bond or in the contract requires the contractor to continue the work without such payment.

The bank argues, in effect, that nothing was due on application number 29 because that application overstated the "work completed and stored to date" by more than $72,000, and when that amount is deducted and all payments are credited on the costs reimbursable under the contract, no further payment was due when the contractor gave notice and stopped the work. Consequently, the bank argues, even though the owner may have owed additional sums outside the scope of the contract and may have been in default in its payment of those items the owner's default in this respect cannot be attributed to the bank, and there was no unpaid balance on work actually done under the contract that justified the contractor in stopping the work.

This argument is based on *New Amsterdam Casualty Company v. Bettes,* 407 S.W.2d 307 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.), in which a construction lender was permitted to recover against the surety on the contractor's performance bond for default by the contractor, who had abandoned the job in admitted violation of his obligations under the contract. The surety sought to escape liability on the ground that the contractor had presented

and received payment on certificates that the owner knew to be false. The court held that such knowledge could not be attributed to the innocent lender so as to defeat its recovery against the surety for the contractor's admitted default. The crucial distinction is that in the present case the contractor was not in default, as the jury found in answer to issue number 15. Consequently, whether the owner's default bars the bank's recovery is immaterial. When the contractor had not been paid the amount due, it was entitled, on proper notice, to stop the work. It was not guilty of any breach of contract for which it is liable in damages, either to the owner or to the bank.

The bank would have standing to complain of the application of payments and the contract accounting procedure between the owner and the contractor only in the event it had been misled and had relied to its prejudice on the amount shown as "total completed and stored to date" in application number 29 and previous applications. The present record contains no pleadings, evidence, or request for submission of issues raising this question in the trial court. Consequently, we conclude that the bank had no independent right of recovery against the contractor or its surety.

### 3. *Inception of Contractor's Lien*

■ The bank also complains that the trial court erred in awarding the contractor a prior lien, superior to the bank's deed of trust, on the apartment project. In this connection, the bank asserts that there is no evidence to support the jury's finding in answer to special issue number 12 to the effect that the contractor had commenced visible construction of the project under the terms of the contract before the bank filed its deed of trust for record on July 20, 1973. This issue submits the question of the "inception" of a contractor's statutory lien, in terms of its definition in article 5459, section 2(a), of the Texas Revised Civil Statutes (Vernon Supp.1978), as follows:

The actual commencement of construction of improvements or the delivery of material to the land upon which the improvements are to be located for use thereon for which the lien herein provided results, provided such commencement or material is actually visible from inspection of the land upon which the improvements are being made.

The bank relies on the testimony of its loan officer that he had visited the site before July 20 and had seen no sign of visible work except the site preparation work done by another contractor. The bank urges that in order for the contractor's lien to have had its inception before July 20, the contractor's work at the site must have been such as to put the bank on notice that work under the construction contract itself was being done. The bank also argues that the contractor's own records show that Campbell's testimony concerning men at work at the site before July 20 was erroneous.

We hold that the jury's finding that work done by the contractor before July 20, 1973 was "actually visible from inspection of the land" is supported by Campbell's testimony, which the jury apparently believed. Campbell testified that before July 20, 1973, the contractor had caused four to six inches of soil to be removed from the site by earthmoving machinery, had set stakes for foundations for at least three buildings, had hauled several cubic yards of fill dirt and compacted it inside the building area, had done hand excavation for some of the grade beams, and had begun setting the forms around the outside of the foundations. The fact that the bank's officer may have been erroneously informed that all the work he saw was being done by another contractor would not establish that the work done under the contract in question was not, in fact, "visible," as provided by the statute. The bank's evidence only raised a fact issue, which the jury has resolved in the contractor's favor.

### 4. *Contractor's Lien for Lost Profit*

■ The contractor presents a cross-point complaining of the court's failure to include its lost profit within the lien for which foreclosure was ordered. We overrule this

point on the ground that the contractor is not entitled to a statutory lien for the amount of the profit lost on work not performed.

The contract provides for a fixed fee of $131,000 over and above reimbursable costs and requires ninety percent of the fee to be paid with the progress payments. One of the items shown on each application for payment is the contractor's profit. Presumably this item concerns part payment of the fee provided in the contract. The amount of profit shown on the application number 29 is $91,281, most of which had been included in previous applications. The jury found that the amount of "uncompensated services performed and labor and materials furnished" by the contractor and its subcontractors was $160,144. Presumably, this amount includes the contractor's fee for work actually done. The jury also found that the amount of the profit the contractor would have made if it had completed the project was $30,216. Judgment was rendered for the contractor for both of these amounts, aggregating $190,360, with interest, but the $30,216 lost profit was not included in the amount for which the lien was foreclosed.

We assume, without deciding, that the contractor has a lien for his contractual fee for work actually performed. The question presented by the cross-point is whether the contractor has a lien for the profit he would have earned on services not performed because of the owner's breach.

No authority is cited, and we have found none, supporting the contractor's contention that he has a lien for the lost profit. The statute gives the contractor a lien "for the labor done or the material furnished or both for such construction." Tex.Rev.Civ.Stat. Ann., art. 5452, § 1 (Vernon Supp.1978). Under this provision it is clear that a profit is secured by a statutory lien only to the extent that it may be considered compensation for services actually rendered as distinguished from the amount of the contractor's loss because of the owner's breach of the contract.

The only analogous Texas authority we have found holds that anticipated profit is not a proper basis for recovery of an attorney's fee authorized by article 2226 of the Texas Revised Civil Statutes in a suit for "personal services rendered, labor done, material[s] furnished," etc. *South Builders, Inc. v. Brown,* 449 S.W.2d 542 (Tex.Civ.App. —Eastland 1970, writ ref'd n.r.e.).

Although we find no authority construing the Texas lien statute in this respect, the Supreme Court of Kansas denied a lien under a similar statute for the profit expected on the balance of an uncompleted contract. *Elder Mercantile Co. v. Ottawa Inv. Co.,* 100 Kan. 597, 165 P. 279, 283 (1917). This holding is consistent with the theory that the lien provided in such a statute is based on enhancement of the property as a result of the labor and materials furnished. *Bangor Roofing & Sheet Metal Co. v. Robbins Plumbing Co.,* 151 Me. 145, 116 A.2d 664, 666 (1955). Even if the contractor's profit on work actually done may be considered compensation for services enhancing the value of the property, *no such enhancement results from work left undone, regardless of who was responsible for the discontinuance.*

Affirmed.